**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ——————————————————— x | |
| Joseph Asaro, individually and on behalf of all others similarly situated, : : | |
| : | Case No. |
| Plaintiff, : | |
| v.  : | |
| : | |
| : | |
| Irwin Naturals, : | **CLASS ACTION COMPLAINT** |
| : | |
| : | **JURY TRIAL DEMANDED** |
| Defendant. : | |
| : | |
| : | |
| ——————————————————— x | |

Plaintiff, Joseph Asaro (hereinafter "Plaintiff"), individually and on behalf of all others similarly situated, by his attorneys, alleges the following upon information and belief, except for those allegations pertaining to Plaintiff, which are based on personal knowledge:

## NATURE OF THE ACTION

1.      This action seeks to remedy the deceptive and misleading business practices of Irwin Naturals (hereinafter "Defendant") with respect to the marketing and sales of Defendant Irwin Naturals' products throughout the state of New York.  Irwin Naturals' products include the following products (hereinafter the "Products"):

- Irwin Naturals Power to Sleep PM Wake Up Refreshed;

- Irwin Naturals Global Wellness Immuno-Shield with Mega D3;

- Irwin Naturals Keto-Karma Burn Fat Red with Nitric Oxide Booster;

- Irwin Naturals Green Tea Fat Metabolizer;

1

- Irwin Naturals Immuno-Shield All Season Wellness;

- Irwin Naturals Only One Liquid-Gel Multi With Iron;

- Irwin Naturals Sunny Mood with 5-HTP;

- Irwin Naturals Only One Liquid-Gel Multi Without Iron;

- Irwin Naturals Stress-Defy;

- Irwin Naturals Body Fat Diet System-Six Red with Nitric Oxide Booster;

- Irwin Naturals 3-in-1 Joint Formula;

- Irwin Naturals Milk Thistle Liver Detox;

- Irwin Naturals System-Six;

- Irwin Naturals Ginkgo Smart Maximum Focus & Memory;

- Irwin Naturals Mega B-Complex with "Quick Energy" MCT's;

- Irwin Naturals Longer, Stronger Hair and Nails;

- Irwin Naturals Vita-C Plus Urgent Rescue;

- Irwin Naturals Living Green Liquid-Gel Multi;

- Irwin Naturals Global Wellness Immuno-Shield with Elderberry;

- Irwin Naturals Whole-Body Turmeric+ Curcumin C3 Complex;

- Irwin Naturals Maximum Strength 3-in-1 Carb Blocker;

- Irwin Naturals High Potency Mega D3 & K2 + Turmeric Extract;

- Irwin Naturals Stored-Fat Belly Burner.

2.      Defendant manufactures, sells, and distributes the Products using a marketing and advertising campaign centered around claims that appeal to health-conscious consumers, i.e., that

2

its Products are "Natural;" however, Defendant's advertising and marketing campaign is false, deceptive, and misleading because the Products contain non-natural, synthetic ingredients.

3.       Plaintiff and those similarly situated ("Class Members") relied on Defendant's misrepresentations that the Products are "Natural" when purchasing the Products.  Plaintiff and Class Members paid a premium for the Products based upon their "Natural" representation.  Given that Plaintiff and Class Members paid a premium for the Products based on Defendant's misrepresentations that they are natural, Plaintiff and Class Members suffered an injury in the amount of the premium paid.

4.       Defendant's conduct violated and continues to violate, *inter alia*, New York General Business Law §§ 349 and 350.  Defendant breached and continues to breach its warranties regarding the Products.  Defendant has been and continues to be unjustly enriched.  Accordingly, Plaintiff brings this action against Defendant on behalf of herself and Class Members who purchased the Products during the applicable statute of limitations period (the "Class Period").

## **FACTUAL BACKGROUND**

5.       Consumers have become increasingly concerned about the effects of synthetic and chemical ingredients in food, cleaning products, bath and beauty products and everyday household products.  Companies such as Defendant have capitalized on consumers' desire for purportedly "natural products."  Indeed, consumers are willing to pay, and have paid, a premium for products

branded "natural" over products that contain synthetic ingredients.  In 2015, sales of natural products grew 9.5% to $180 billion.[1]  Reasonable consumers, including Plaintiff and Class Members, value natural products for important reasons, including the belief that they are safer and healthier than alternative products that are not represented as natural.

6.      Despite the Products containing a number of synthetic ingredients, Defendant markets the Products as "Natural."  The Products' labeling is depicted below:

---

[1] *Natural Products Industry Sales up 9.5% to $180bn Says NBJ,* FOOD NAVIGATOR, http://www.foodnavigator-usa.com/Markets/EXPO-WEST-trendspotting-organics-natural-claims/(page)/6; *see also*  Shoshanna Delventhal, *Study Shows Surge in Demand for "Natural" Products*, INVESTOPEDIA (February 22, 2017), http://www.investopedia.com/articles/investing/022217/study-shows-surge-demand-natural-products.asp (Study by Kline Research indicated that in 2016, the personal care market reached 9% growth in the U.S. and 8% in the U.K. The trend-driven natural and organic personal care industry is on track to be worth $25.1 million by 2025); *Natural living: The next frontier for growth? [NEXT Forecast 2017]*, NEW HOPE NTWORK (December 20, 2016), http://www.newhope.com/beauty-and-lifestyle/natural-living-next-frontier-growth-next-forecast-2017.

**Irwin Naturals Power to Sleep PM Wake Up Refreshed**



**Synthetic Ingredients:**

Gelatin
Glycerin
Soy Lecithin
Dextrin
Titanium Dioxide
Maltodextrin

**Irwin Naturals Global Wellness Immuno-Shield with Mega D3**



**Synthetic Ingredients:**

Gelatin
Glycerin
Soy Lecithin
Maltodextrin
Titanium Dioxide
Carboxymethylcellulose

6

**Irwin Naturals Keto-Karma Burn Fat Red with Nitric Oxide Booster**



**Synthetic Ingredients:**

Niacin (as Niacinamide)
Gelatin
Glycerin
Maltodextrin
Silicon Dioxide
Titanium Dioxide
Riboflavin
Thiamine (as Thiamine Hydrochloride)

7

**Irwin Naturals Green Tea Fat Metabolizer**



**Synthetic Ingredients:**

Gelatin
Glycerin
Soy Lecithin
Titanium Dioxide

8

**Irwin Naturals Immuno-Shield All Season Wellness**



**Synthetic Ingredients:**

Vitamin C (as Ascorbic Acid)
Vitamin E (as d-Alpha Tocopherol)
Gelatin
Glycerin
Soy Lecithin
Maltodextrin
Dextrin
Titanium Dioxide

9

**Irwin Naturals Only One Liquid-Gel Multi With Iron**



**Synthetic Ingredients:**

Vitamin A (as Beta Carotene)
Vitamin C (as Ascorbic Acid)
Vitamin E (as d-Alpha Tocopherol)
Riboflavin
Gelatin
Glycerin
Soy Lecithin
Titanium Dioxide
Niacin (as Niacinamide)
Thiamine (as Thiamine Hydrochloride)

10

**Irwin Naturals Sunny Mood with 5-HTP**



**Synthetic Ingredients:**

Gelatin
Glycerin
Dextrin
Soy Lecithin
Maltodextrin
Titanium Dioxide
Riboflavin
Silicon Dioxide
Microcrystalline Cellulose

11

**Irwin Naturals Only One Liquid-Gel Multi Without Iron**



**Synthetic Ingredients:**

Vitamin A (as Beta Carotene)
Vitamin C (as Ascorbic Acid)
Vitamin E (as d-Alpha Tocopherol)
Riboflavin
Gelatin
Glycerin
Soy Lecithin
Titanium Dioxide
Dicalcium Phosphate
Niacin (as Niacinamide)

12

**Irwin Naturals Stress-Defy**



**Synthetic Ingredients:**

Riboflavin
Gelatin
Glycerin
Soy Lecithin
Maltodextrin
Titanium Dioxide
Silicon Dioxide
Thiamine (as Thiamine Mononitrate)

13

**Irwin Naturals Body Fat Diet System-Six Red with Nitric Oxide Booster**



**Synthetic Ingredients:**

Riboflavin
Gelatin
Glycerin
Maltodextrin
Silicon Dioxide
Titanium Dioxide
Niacin (as Niacinamide)

14

**Irwin Naturals 3-in-1 Joint Formula**



**Synthetic Ingredients:**

Vitamin E (as d-Alpha Tocopherol)
Gelatin
Glycerin
Soy Lecithin
Titanium Dioxide
Dicalcium Phosphate
Maltodextrin
Niacin (as Niacinamide)

15

**Irwin Naturals Milk Thistle Liver Detox**



**Synthetic Ingredients:**

Vitamin C (as Ascorbic Acid)
Gelatin
Glycerin
Soy Lecithin
Maltodextrin
Titanium Dioxide
Silicon Dioxide

16

**Irwin Naturals System-Six**



**Synthetic Ingredients:**

Vitamin C (as Ascorbic Acid)
Vitamin E (as d-Alpha Tocopherol)
Riboflavin
Gelatin
Glycerin
Soy Lecithin
Titanium Dioxide
Maltodextrin
Niacin (as Niacinamide)

17

**Irwin Naturals Ginkgo Smart Maximum Focus & Memory**



**Synthetic Ingredients:**

Gelatin
Glycerin
Soy Lecithin
Dextrin
Titanium Dioxide

18

**Irwin Naturals Mega B-Complex with "Quick Energy" MCT'**



**Synthetic Ingredients:**

Riboflavin
Gelatin
Glycerin
Soy Lecithin
Titanium Dioxide
Silicon Dioxide
Dicalcium Phosphate
Niacin (as Niacinamide)

19

**Irwin Naturals Longer, Stronger Hair and Nails**



**Synthetic Ingredients:**

Gelatin
Glycerin
Soy Lecithin
Titanium Dioxide
Dextrin
Maltodextrin

20

**Irwin Naturals Vita-C Plus Urgent Rescue**



**Synthetic Ingredients:**

Vitamin C (as Ascorbic Acid)
Gelatin
Glycerin
Soy Lecithin
Dextrin
Titanium Dioxide
Maltodextrin
Silicon Dioxide

21

### Irwin Naturals Living Green Liquid-Gel Multi



### Synthetic Ingredients:

Vitamin A (as Beta Carotene)
Vitamin C (as Ascorbic Acid)
Vitamin E (as d-Alpha Tocopherol)
Thiamin (as Thiamine Mononitrate)
Riboflavin
Niacin (as Niacinamide)
Zinc (as Zinc Oxide)
Gelatin
Glycerin
Soy Lecithin
Titanium Dioxide
Dicalcium Phosphate

22

**Irwin Naturals Global Wellness Immuno-Shield with Elderberry**



**Synthetic Ingredients:**

Vitamin C (as Ascorbic Acid)
Gelatin
Glycerin
Soy Lecithin
Maltodextrin
Titanium Dioxide
Silicon Dioxide

23

**Irwin Naturals Whole-Body Turmeric+ Curcumin C3 Complex**



**Synthetic Ingredients:**

Gelatin
Glycerin
Soy Lecithin
Titanium Dioxide
Silicon Dioxide
Maltodextrin

**Irwin Naturals Maximum Strength 3-in-1 Carb Blocker**



**Synthetic Ingredients:**

Gelatin
Glycerin
Soy Lecithin
Maltodextrin
Dextrin
Titanium Dioxide
Silicon Dioxide

**Irwin Naturals High Potency Mega D3 & K2 + Turmeric Extract**



**Synthetic Ingredients:**

Gelatin
Glycerin
Soy Lecithin
Maltodextrin
Titanium Dioxide
Carboxymethylcellulose

26

**Irwin Naturals Stored-Fat Belly Burner**



**Synthetic Ingredients:**

Gelatin
Glycerin
Soy Lecithin
Titanium Dioxide
Silicon Dioxide

27

7.    Defendant's representations that the Products are natural, are false, misleading, and deceptive because the Products contain multiple ingredients that are, as explained below, synthetic.

a.    **Tocopherol (Tocopheryl Acetate)** is a synthetic, inert ingredient used pre and post-harvest as an ingredient in pesticide formulations applied to growing crops or to raw agricultural commodities after harvest.  *See* 40 C.F.R. §180.910.

b.    **Gelatin** is a synthetic ingredient that is commercially processed using hydrolysis. See 9 C.F.R. §94.20.

c.    **Soy Lecithin** is a phospholipid that is widely used as an emulsifier in food industries.  Soy lecithin comprises of phosphatidylcholine, phosphatidylethanolamine, phosphatidylinositol, phosphatidic acid, other minor phospholipids, glycolipid, and neutral lipids. [2]  It is derived from GMO's and/or GE seeds in which DNA splicing has been used to place genes from another source into a plant.  Soy Lecithin is heavily processed to remove the natural bean flavor so that the finished "soy" product no longer tastes like soy.  The soy is further refined through unnatural processes using chemical additives.  Soy lecithin is commonly refined through the use of a volatile, synthetic solvent called hexane, which is processed from petroleum.  *See* 40 C.F.R. 799.2155.

d.    **Maltodextrin** is recognized as a synthetic by federal regulations. Maltodextrin is a saccharide polymer that is prepared as a white powder or concentrated solution by partial hydrolysis of corn starch, potato starch, or rice starch using acids and

---

[2] http://www.davidpublishing.com/davidpublishing/Upfile/3/4/2013/2013030471047201.pdf

enzymes.  (72 Fed. Reg. 62149, 62166 (proposed Nov. 2, 2007); 21 C.F.R. § 184.1444).  Maltodextrin is primarily used as a carrier or bulking agent.  It is a synthetic factory-produced texturizer that is created by complex processing that does not occur in nature.  To produce maltodexrin, acids and/or enzymes are applied in sequence to a starch to produce partial hydrolysis (saccharification).  The acids or enzymes convert or depolymerize starch to glucose or maltose molecules.  Once maltose is high enough for maltodextrin, the acids or enzymes are neutralized, removed, or deactivated.  (57 Fed. Reg. 23989 (proposed June 5, 1992)).  *See also Maltodextrins*, GMO COMPASS, Dec. 10, 2008, available at http://www.gmo-compass.org/eng/database/ingredients/148.maltodextrins.html

e.  **Silicon Dioxide** and is an anticaking agent.  *See* 21 C.F.R. §172.480.

f.  **Dextrin**, which is created from starch using hydrochloric acid and enzymes in multi-stage chemical process, is not a natural ingredient.  On May 14, 2020, the National Advertising Division ("NAD") issued a ruling **(Attachment A)** concluding that the dextrin in prebiotic fiber supplements was not "natural."   NAD reached this conclusion by reviewing the complex chemical process used to produce the dextrin.   The process begins with starch, a carbohydrate derived from wheat.  Hydrochloric acid is added to the starch and the starch is then heated to a high temperature, which creates new bonds between the glucose sugars.  Next, an enzyme, α-amylase, is added to the mixture, which further reduces the molecular weight of the polymer chains.  After the enzyme is added, the preferred polymers

29

are selected, collected from the mixture, filtered to remove impurities, then concentrated to remove water and increase the concentration of polysaccharides to transform the solution into a dry powder.  Then, the substance is subjected to chromatography which allows the manufacture to select specific polysaccharides by molecular weight to alter the weight distribution of the mixture and allows for the removal of small sugar molecules, which further increases the fiber content of the mixture.  Finally, the product is purified by ion exchange, evaporated, and then spray dried to product the final starch ingredient.  As NAD noted, this process "transforms the source ingredient – starch – which is digestible and has 0% dietary fiber, into a new ingredient – dextrin – which is non-digestible and has 85% dietary fiber."  Upon consideration of the chemical process used to create dextrin, NAD concluded that reasonable consumers would not consider prebiotic fiber supplements with dextrin to be natural because "ingredients that are derived from nature and undergo significant chemical alterations are often not 'natural' in the way that consumers expect them to be."

g. **Titanium Dioxide** is a color additive that is synthetically prepared Ti02, free from admixture with other substances.[3]

h. **Ascorbic Acid** is a chemical preservative and is synthetic.  *See* 21 C.F.R. § 182.3013.

---

[3] http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/cfrsearch.cfm?fr=73.575

**i.** **Betacarotene** (CAS Reg. No. 7235-40-7) has the molecular formula $C_{40}H_{56}$. It is synthesized by saponification of vitamin A acetate.  The resulting alcohol is either reacted to form vitamin A Wittig reagent or oxidized to vitamin A aldehyde.  Vitamin A Wittig reagent and vitamin A aldehyde are reacted together to form betacarotene.  *See* 21 C.F.R. § 184.1245.

**j.** **Carboxymethyl cellulose** is synthesized by the alkali-catalyzed reaction of cellulose with chloroacetic acid.[4]

**k.** **Riboflavin** ($C_{17}H_{20}N_4O_6$, CAS Reg. No. 83885) occurs as yellow to orange yellow needles that are crystallized from 2N acetic acid, alcohol, water, or pyridine.  It may be prepared by chemical synthesis, biosynthetically by the organism Eremothecium ashbyii, or isolated from natural sources.  21CFR § 184.1695.  Further, as set forth in 21 CFR § 73.450, riboflavin is a color additive.  Riboflavin is synthetic.

**l.** **Thiamine Hydrochloride** ($C_{12}H_{17}C_1N_4OS$-HCl, CAS Reg. No. 67-03-8) is the chloride-hydrochloride salt of thiamine.  It occurs as hygroscopic white crystals or a white crystalline powder.  The usual method of preparing this substance is by linking the preformed thiazole and pyrimidine ring systems.  *See* 21 C.F.R. § 184.1875.

---

[4] Hollabaugh, C.B.; Burt, Leland H.; Walsh, Anna Peterson (October 1945). "Carboxymethylcellulose... Uses and Applications". Industrial and Engineering Chemistry. 37 (10): 943–947.

**m. Niacin** (C6H5NO2, CAS Reg. No. 59-67-6) is the chemical 3-pyridinecarboxylic acid (nicotinic acid). It is a non-hygroscopic, stable, white, crystalline solid that sublimes without decomposition at about 230 deg. C.  It is soluble in water and alcohol.  It is insoluble in ether.   21CFR § 184.1530.  Niacin is synthetic.

**n. Thiamine Mononitrate** (C12H17N5O4S, CAS Reg. No. 532-43-4) is the mononitrate salt of thiamine.  It occurs as white crystals or a white crystalline powder and is prepared from thiamine hydrochloride by dissolving the hydrochloride salt in alkaline solution followed by precipitation of the nitrate half-salt with a stoichiometric amount of nitric acid."  (21 C.F.R. § 184.1878).  Thiamine mononitrate is synthetic, and is chemically distinct from thiamine.  (47 Fed. Reg. 47438; 21 C.F.R. § 184.1878).  The amount of nitrates added to processed and preserved foods over the past several decades has exponentially increased.  The nitrates present in thiamine mononitrate can cause health problems.  "Exposure to higher levels of nitrates or nitrites has been associated with increased incidence of cancer in adults, and possible increased incidence of brain tumors, leukemia, and nasopharyngeal (nose and throat) tumors in children[.]"  (internal citations omitted).  Some studies have linked nitrate exposure in children to increased incidence of childhood diabetes, recurrent diarrhea and recurrent respiratory tract infections.  (*Id*. at 3)**.** Other reported effects of chronic exposure reported in adults include frequent urination and spleen hemorrhaging.  (*Id*. at 3).  "Health effects that were significantly associated

32

with nitrate or nitrite exposure during pregnancy include increased incidence of intrauterine growth retardation, cardiac defects, central nervous system defects, Sudden Infant Death Syndrome (SIDS), and miscarriage." (*Id*. at 4 (internal citations omitted)). Research has also connected the increased use of nitrates and nitrites in western societies with increased rates of cognitive impairment, Alzheimer's disease, and brain insulin resistance.

o.  **Microcrystalline Cellulose** is a chemically modified form of naturally occurring cellulose. The hydrolysis process breaks the beta -1,4 glycosidic bonds causing a complete structural and functional change from its native form. Therefore, it is classified as a synthetic additive.[5]

p.  **Dicalcium Phosphate** is derived from bovines by precipitating the phosphate extracted from a very high grade of bone by the use of high-grade chemical lime. [6] It is a recognized synthetic chemical under federal regulations. *See* 7 C.F.R. §205.605(b).

q.  **Zinc Oxide** is a synthetic compound. *See, e.g.*, 7 C.F.R. § 205.601(j)(6)(ii). Zinc oxide used in commercial purposes is usually produced by chemical synthesis or by vaporizing metallic zinc at extreme high heat.

r.  **Glycerin** is a factory-produced texturizer that is created by complex processing. It is recognized by federal regulations as synthetic. *See* 7 C.F.R. § 205.605(b). It

---

[5] https://foodadditives.net/anticaking-agent/microcrystalline-cellulose/
[6] https://kb.osu.edu/dspace/bitstream/handle/1811/60894/OARDC_bulletin_n455.pdf?sequence=1

is commonly used as a filler and thickening agent.  It requires multiple processing steps in an industrial environment to create glycerin.  Therefore, it cannot be described as "natural."  A technical evaluation report compiled by the USDA AMS Agricultural Analytics Division for the USDA National Organic Program explains that Glycerin is "produced by a hydrolysis of fats and oils" and is listed in the USDA Organic Program's National List as a "synthetic nonagricultural (nonorganic) substance."  The same report lists several methods of producing glycerin, each of which involve numerous steps that include the use of high temperatures, pressure, and purification to get an end product.

| Processes for producing glycerin by hydrolysis of fats and oils[7] | |
|---|---|
| Lemmens Fryer's Process | Oil or fat is subjected in an autoclave to the conjoint action of heat and pressure (about 100 PSI) in the presence of an emulsifying and accelerating agent, e.g. zinc oxide or hydroxide (sodium hydroxide can be substituted) for about eight hours. The strong solution of glycerin formed is withdrawn and replaced by a quantity of hot, clean and preferably distilled water equal to about one third to one fourth of the weight of the original charge of oil or fat and treatment continued for an additional four hours. The dilute glycerin obtained from the latter part of the process is drawn off and used for the initial treatment of the further charge of oil or fat. |
| Budde and Robertson's Process | The oils or fats are heated and mechanically agitated with water and sulphuric acid gas, under pressure in a closed vessel or autoclave. The advantage claimed for the process are that the contents of the vessel are free from foreign matter introduced by reagents and need no purification; that the liberated glycerin is in the form of a pure and concentrated solution; that no permanent emulsion is formed and that the fatty acids are not discolored. |

---

[7] https://www.ams.usda.gov/sites/default/files/media/Glycerin%20Petition%20to%20remove%20TR%202013.pdf

| Ittner's Process | Coconut oil is kept in an autoclave in the presence of water at 70 atmospheres pressure and 225-245oC temperature and split into fatty acids and glycerin, both being soluble under these conditions in water. The glycerin solution separates in the bottom of the autoclave. The aqueous solution contains at the end of the splitting process more than 30 percent glycerin. |
| --- | --- |
| Continuous High-Pressure Hydrolysis | In this process a constant flow of fat is maintained flowing upward through an autoclave column tower against a downward counterflow of water at a pressure of 600 PSI maintained at temperature of 480-495oF. Under these conditions, the fat is almost completely miscible in water and the hydrolysis take place in a very short time. The liberated fatty acids, washed free of glycerin by the downward percolating water, leave the top of the column and pass through a flash tank while the liberated glycerin dissolves in the downward flow of water and is discharged from the bottom of the tower into the sweet-water storage tank. |

8.     Whether Defendant's labeling of the Products as natural is deceptive is judged by whether it would deceive or mislead a reasonable person.  To assist in ascertaining what a reasonable consumer believes the term natural means, one can look to the regulatory agencies for their guidance.

9.     In 2013, the United States Department of Agriculture ("USDA") issued a Draft Guidance Decision Tree for Classification of Materials as Synthetic or Nonsynthetic (Natural).  In accordance with this decision tree, a substance is natural—as opposed to synthetic—if: (a) it is manufactured, produced, or extracted from a natural source (i.e. naturally occurring mineral or biological matter); (b) it has not undergone a chemical change (i.e. a process whereby a substance is transformed into one or more other distinct substances) so that it is chemically or structurally different than how it naturally occurs in the source material; or (c) the chemical change was created

35

by a naturally occurring biological process such as composting, fermentation, or enzymatic digestion or by heating or burning biological matter. **(Attachment B).**

10.     Congress has defined "synthetic" to mean "a substance that is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plants, animals, or mineral sources . . . ." 7 U.S.C. § 6502 (21).

11.     Consumers lack the meaningful ability to test or independently ascertain or verify whether a product is natural, especially at the point of sale.  Consumers would not know the true nature of the ingredients merely by reading the ingredients label.

12.     Discovering that the ingredients are not natural and are actually synthetic requires a scientific investigation and knowledge of chemistry beyond that of the average consumer.  This is why, even though the ingredients listed above are identified on the back of the Products' packaging in the ingredients listed, the reasonable consumer would not understand – nor are they expected to understand - that these ingredients are synthetic.

13.     Moreover, the reasonable consumer is not expected or required to scour the ingredients list on the back of the Products in order to confirm or debunk Defendant's prominent claims, representations, and warranties that the Products are natural.

14.     Defendant did not disclose that the above listed ingredients are synthetic ingredients.  A reasonable consumer understands Defendant's "Natural" claims to mean that the Products are natural and do not contain synthetic ingredients.

15.     Defendant has thus violated, *inter alia*,  NY General Business Law § 392-b by: a) putting upon an article of merchandise, bottle, wrapper, package, label, or other thing containing

36

or covering such an article, or with which such an article is intended to be sold, or is sold, a false description or other indication of or respecting the kind of such article or any part thereof; and b) selling or offering for sale an article which, to its knowledge, is falsely described or indicated upon any such package or vessel containing the same, or label thereupon, in any of the particulars specified.

16.     Consumers rely on label representations and information in making purchasing decisions.

17.     The marketing of the Products as "Natural" in a prominent location on the labels of all of the Products, throughout the Class Period, evidences Defendant's awareness that natural claims are material to consumers.

18.     Defendant's deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

19.     Plaintiff and the Class Members reasonably relied to their detriment on Defendant's misleading representations and omissions.

20.     Defendant's false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers and the general public, as they have already deceived and misled Plaintiff and the Class Members.

21.     In making the false, misleading, and deceptive representations and omissions described herein, Defendant knew and intended that consumers would pay a premium for Products labeled as being "Natural" over comparable products not so labeled.

22.     As an immediate, direct, and proximate result of Defendant's false, misleading, and deceptive representations and omissions, Defendant injured Plaintiff and the Class Members in that they:

      **a.**     Paid a sum of money for Products that were not what Defendant represented;

      **b.**     Paid a premium price for Products that were not what Defendant represented;

      **c.**     Were deprived of the benefit of the bargain because the Products they purchased were different from what Defendant warranted;

      **d.**     Were deprived of the benefit of the bargain because the Products they purchased had less value than what Defendant represented;

      **e.**     Ingested a substance that was of a different quality than what Defendant promised; and

      **f.**     Were denied the benefit of the beneficial properties of the natural supplement Defendant promised.

23.     Had Defendant not made the false, misleading, and deceptive representations and omissions, Plaintiff and the Class Members would not have been willing to pay the same amount for the Products they purchased.

24.     Plaintiff and the Class Members paid for Products that are natural but received Products that are not natural.  The Products Plaintiff and the Class Members received were worth less than the Products for which they paid.

25.     Plaintiff and the Class Members all paid money for the Products; however, Plaintiff and the Class Members did not obtain the full value of the advertised Products due to Defendant's misrepresentations and omissions.  Plaintiff and the Class Members purchased, purchased more

of, and/or paid more for the Products than they would have had they known the truth about the Products. Consequently, Plaintiff and the Class Members have suffered injury in fact and lost money as a result of Defendant's wrongful conduct.

**JURISDICTION AND VENUE**

26.     This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. section 1332(d) in that: (1) this is a class action involving more than 100 class members; (2) Plaintiff is a citizen of the state of New York and Defendant Irwin Naturals is a citizen of the state of California; and (3) the amount in controversy is in excess of $5,000,000, exclusive of interests and costs.

27.     This Court has personal jurisdiction over Defendant because Defendant conducts and transacts business in the state of New York, contracts to supply goods within the state of New York, and supplies goods within the state of New York.

28.     Venue is proper because Plaintiff and many Class Members reside in the Eastern District of New York, and throughout the state of New York. A substantial part of the events or omissions giving rise to the Classes' claims occurred in this district.

**PARTIES**

**Plaintiff**

29.     Plaintiff is an individual consumer who, at all times material hereto, was a citizen of New York State. Plaintiff purchased the Products during the Class Period. More specifically, Plaintiff purchased Defendant's Irwin Naturals – Power to Sleep PM (120 liquid softgels) within the past year for a purchase price of $28.13 from Amazon.com. Plaintiff purchased the Product in

the state of New York, had the product shipped to his home in the state of New York, and viewed the Product's labeling (which identified it as being natural) on Amazon.com in the state of New York.

30.     The packaging of the Products Plaintiff purchased contained the representation that they were "Natural."  Plaintiff believes that products that are labeled as natural do not contain synthetic ingredients.  Plaintiff believes a synthetic ingredient is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plant, animal, or mineral sources.  If the Products actually were natural, as represented on the Products' label, Plaintiff would purchase the Products in the immediate future.

31.     Had Defendant not made the false, misleading, and deceptive representation that the Products were natural, Plaintiff would not have been willing to pay the same amount for the Products, and, consequently, would not have been willing to purchase the Products.  Plaintiff purchased, purchased more of, and/or paid more for, the Products than he would have had he known the truth about the Products.  The Products Plaintiff received were worth less than the Products for which he paid.  Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

**Defendant**

32.     Defendant Irwin Naturals is a corporation with its principal place of business in Los Angeles, California.  Defendant manufactures, markets, advertises, and distributes the Products throughout the United States.  Defendant created and/or authorized the false, misleading, and deceptive advertisements, packaging, and labeling for the Products.

40

## **CLASS ALLEGATIONS**

33.     Plaintiff brings this matter on behalf of himself and those similarly situated.  As detailed at length in this Complaint, Defendant orchestrated deceptive marketing and labeling practices.  Defendant's customers were uniformly impacted by and exposed to this misconduct. Accordingly, this Complaint is uniquely situated for class-wide resolution, including injunctive relief.

34.     The Class is defined as all individuals who purchased the Products in the state of New York during the Class Period (the "Class").

35.     The Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy because:

36.     Numerosity: Class Members are so numerous that joinder of all members is impracticable.  Plaintiff believes that there are thousands of consumers who are Class Members described above who have been damaged by Defendant's deceptive and misleading practices.

37.     Commonality: The questions of law and fact common to the Class Members which predominate over any questions which may affect individual Class Members include, but are not limited to:

      a.   Whether Defendant is responsible for the conduct alleged herein which was uniformly directed at all consumers who purchased the Products;

b. Whether Defendant's misconduct set forth in this Complaint demonstrates that Defendant has engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of their Products;

c. Whether Defendant made false and/or misleading statements to the Class and the public concerning the contents of its Products;

d. Whether Defendant's false and misleading statements concerning its Products were likely to deceive the public;

e. Whether Plaintiff and the Class are entitled to injunctive relief; and

f. Whether Plaintiff and the Class are entitled to money damages under the same causes of action as the other Class Members?

38.     Typicality: Plaintiff is a member of the Class.  Plaintiff's claims are typical of the claims of each Class Member in that every member of the Class was susceptible to the same deceptive, misleading conduct and purchased Defendant's Products.  Plaintiff is entitled to relief under the same causes of action as the other Class Members.

39.     Adequacy: Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the Class Members he seeks to represent, his consumer fraud claims are common to all members of the Class and he has a strong interest in vindicating his rights, he has retained counsel competent and experienced in complex class action litigation, and counsel intends to vigorously prosecute this action.

40.     Predominance: Pursuant to Rule 23(b)(3), the common issues of law and fact identified above predominate over any other questions affecting only individual members of the

42

Class.  The Class issues fully predominate over any individual issue because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendant's deceptive and misleading marketing and labeling practices.

41.    <u>Superiority</u>: A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

 a.  The joinder of thousands of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

 b.  The individual claims of the Class Members may be relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome, and expensive—if not totally impossible—to justify individual actions;

 c.  When Defendant's liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

 d.  This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

 e.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

 f.  This class action will assure uniformity of decisions among Class Members;

g.  The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation;

h.  Class Members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by single class action; and

i.  It would be desirable to concentrate in this single venue the litigation of all plaintiffs who were induced by Defendant's uniform false advertising to purchase its Products as "Natural."

42.  Accordingly, this Class is properly brought and should be maintained as a class action under Rule 23(b)(3) because questions of law or fact common to Class Members predominate over any questions affecting only individual members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

**FIRST CAUSE OF ACTION**
**VIOLATION OF NEW YORK GBL § 349**
**(On Behalf of Plaintiff and the Class)**

43.  Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

44.  New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . ."

45.  The conduct of Defendant alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of GBL § 349, and as such, Plaintiff and the Class seek

monetary damages and the entry of preliminary and permanent injunctive relief against Defendant, enjoining them from inaccurately describing, labeling, marketing, and promoting the Products.

46.     There is no adequate remedy at law.

47.     Defendant misleadingly, inaccurately, and deceptively advertise and market their Products to consumers.

48.     Defendant's improper consumer-oriented conduct—including labeling and advertising the Products as being "Natural" —is misleading in a material way in that it, *inter alia*, induced Plaintiff and the Class to purchase and pay a premium for Defendant's Products and to use the Products when they otherwise would not have.  Defendant made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

49.     Plaintiff and the Class have been injured inasmuch as they paid a premium for products that were—contrary to Defendant's representations— not natural.  Accordingly, Plaintiff and the Class received less than what they bargained and/or paid for.

50.     Defendant's advertising and Products' packaging and labeling induced Plaintiff and the Class to buy Defendant's Products and to pay a premium price for them.

51.     Defendant's deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of New York General Business Law §349(a) and Plaintiff and the Class have been damaged thereby.

52.     As a result of Defendant's recurring, "unlawful" deceptive acts and practices, Plaintiff and the Class are entitled to monetary, statutory, compensatory, treble and punitive

damages, injunctive relief, restitution, and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

53.     Plaintiff and Class Members seek actual damages under GBL § 349, as well as any minimum, punitive, or treble, and/or statutory damages pursuant to GBL § 349.

**SECOND CAUSE OF ACTION**
**VIOLATION OF NEW YORK GBL § 350**
**(On Behalf of Plaintiff and the Class)**

54.     Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

55.     N.Y. Gen. Bus. Law § 350 provides, in part, as follows:

> False advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in this state is hereby declared unlawful.

56.     N.Y. Gen. Bus. Law § 350a(1) provides, in part, as follows:

> The term 'false advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual . . .

57.     Defendant's labeling and advertisements contain untrue and materially misleading statements concerning Defendant's Products inasmuch as they misrepresent that the Products are "Natural."

58.     Plaintiff and the Class have been injured inasmuch as they relied upon the labeling, packaging, and advertising and paid a premium for the Products which were—contrary to Defendant's representations—not natural.  Accordingly, Plaintiff and the Class received less than what they bargained and/or paid for.

59.     Defendant's advertising, packaging, and Products' labeling induced Plaintiff and the Class to buy Defendant's Products.

60.     Defendant made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

61.     Defendant's conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law § 350.

62.     Defendant made the material misrepresentations described in this Complaint in Defendant's advertising and on the Products' packaging and labeling.

63.     Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large.  Moreover, all consumers purchasing the Products were and continue to be exposed to Defendant's material misrepresentations.

64.     As a result of Defendant's recurring, "unlawful" deceptive acts and practices, Plaintiff and the Class are entitled to monetary, statutory, compensatory, treble and punitive

damages, injunctive relief, restitution, and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

65.     Plaintiff and Class Members seek actual damages under GBL § 350, as well as any minimum, punitive, or treble, and/or statutory damages pursuant to GBL § 350.

**THIRD CAUSE OF ACTION**
**BREACH OF EXPRESS WARRANTY**
**(On Behalf of Plaintiff and the Class)**

66.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

67.     Defendant provided Plaintiff and Class Members with an express warranty in the form of written affirmations of fact promising and representing that the Products are "Natural."

68.     The above affirmations of fact were not couched as "belief" or "opinion," and were not "generalized statements of quality not capable of proof or disproof."

69.     These affirmations of fact became part of the basis for the bargain and were material to Plaintiff's and Class Members' transactions.

70.     Plaintiff and Class Members reasonably relied upon Defendant's affirmations of fact and justifiably acted in ignorance of the material facts omitted or concealed when they decided to buy Defendant's Products.

71.     Within a reasonable time after he knew or should have known of Defendant's breach, Plaintiff, on behalf of himself and Class Members, placed Defendant on notice of its breach by mailing Defendant a pre-suit letter on September 14, 2021, giving Defendant an opportunity to cure its breach, which it refused to do.

48

72.     Defendant breached the express warranty because the Products are not "Natural" because they contain synthetic ingredients.

73.     As a direct and proximate result of Defendant's breach of the express warranty, Plaintiff and Class Members were damaged in the amount of the price they paid for the Products, in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class in the Alternative)**

74.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

75.     Plaintiff, on behalf of himself and consumers nationwide, brings a claim for unjust enrichment.

76.     Defendant's conduct violated, *inter alia*, state and federal law by manufacturing, advertising, marketing, and selling its Products while misrepresenting and omitting material facts.

77.     Defendant's unlawful conduct as described in this Complaint allowed Defendant to knowingly realize substantial revenues from selling its Products at the expense of, and to the detriment or impoverishment of, Plaintiff and Class Members and to Defendant's benefit and enrichment.  Defendant has thereby violated fundamental principles of justice, equity, and good conscience.

78.     Plaintiff and Class Members conferred significant financial benefits and paid substantial compensation to Defendant for the Products, which were not as Defendant represented them to be.

79.     Under New York's common law principles of unjust enrichment, it is inequitable for Defendant to retain the benefits conferred by Plaintiff and Class Members' overpayments.

80.     Plaintiff and Class Members seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiff and Class Members may seek restitution.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues.

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment as follows:

(a) Declaring this action to be a proper class action and certifying Plaintiff as the representative of the Class under FRCP 23;

(b) Awarding monetary damages, including treble and/or punitive damages, pursuant to GBL § 349 and GBL § 350;

(c) Awarding Plaintiff and Class Members their costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys and experts, and reimbursement of Plaintiff's expenses; and

(d) Granting such other and further relief as the Court may deem just and proper.

Dated: September 27, 2021

**THE SULTZER LAW GROUP P.C.**

Jason P. Sultzer /s/

By: _____

Jason P. Sultzer, Esq.
Joseph Lipari, Esq.
Daniel Markowitz, Esq.
85 Civic Center Plaza, Suite 200
Poughkeepsie, NY 12601
Tel: (845) 483-7100
Fax: (888) 749-7747
sultzerj@thesultzerlawgroup.com
liparij@thesultzerlawgroup.com
markowitzd@thesultzerlawgroup.com

David C. Magagna Jr., Esq.
Charles E. Schaffer, Esq.
LEVIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: 215-592-1500
dmagagna@lfsblaw.com
cschaffer@lfsblaw.com

*Counsel for Plaintiff and the Class*

51